UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ILENE BOYAR, | : | CIVIL ACTION NO.: |
| | : | 3:06-CV-663 (RNC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YMCA OF NORWALK, INC. | : | |
| | : | AUGUST 27, 2007 |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

The YMCA of Norwalk ("YMCA" or "Defendant") is a non-profit organization devoted to providing a variety of programs for children and families in the Norwalk community. It has served the community for the last 78 years. Plaintiff Ilene Boyar ("Plaintiff" or "Boyar") was hired by the YMCA on or about March 23, 1993. She was hired as a nautilus instructor in the YMCA's Wellness (fitness) Center. While employed at the YMCA, Plaintiff received various promotions, ultimately occupying the position of Wellness Center Coordinator. More than ten years after her hiring, Plaintiff was terminated on or about April 17, 2004 when she left the fitness center unattended despite several previous warnings about such conduct.

Plaintiff filed this action on April 28, 2006 alleging violations of: (1) the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"); (2) the Family and Medical Leave Act, 29

U.S.C. §§ 2601 et seq. ("FMLA"); and (3) the Connecticut Fair Employment Practices Act, C.G.S. § 46a-60(a)(1) ("CFEPA"). The YMCA seeks summary judgment because Plaintiff's FMLA claim is time-barred, she fails to establish that she is disabled within the meaning of the law, and she fails to offer a scintilla of evidence that her suspension or termination was based on a discriminatory animus. To the contrary, the record uncontrovertibly demonstrates that Plaintiff, an at-will employee, was terminated for her failure to comply with a YMCA rule regarding staff supervision of the fitness center. This entire motion is based on Plaintiff's own testimony, demonstrating that as a matter of law there are no genuine issues of material fact entitling Plaintiff to relief. Accordingly, this lawsuit should be dismissed.

## II.   FACTS

### A.   Background

Plaintiff was hired by the YMCA on March 23, 1993 as a nautilus staff instructor in the fitness center.[1] [Complaint, ¶ 17]. She remained employed by the YMCA until her termination on or about April 17, 2004 for disciplinary reasons. [Deposition Transcript of Ilene Boyar ("Boyar Tr."), relevant portions attached hereto as Exhibit A, pp. 24-25]. At the time of her termination, Plaintiff occupied the position of Wellness Center Coordinator. As Wellness Center Coordinator, Plaintiff was responsible for supervising approximately twelve employees. [Boyar Tr., p. 197]. In that position, she was responsible for enforcing YMCA rules and policies, overseeing the daily operations of the fitness center, scheduling and teaching classes, supervising

---

[1] The Parties use the terms fitness center and wellness center interchangeably.

the staff, and arranging for guest speakers. [Boyar Tr., pp. 44-46, 116]. To the extent that staff was not complying with fitness center rules, Plaintiff was responsible for the enforcement of the rules. [Boyar Tr., pp. 197-98]. Plaintiff also was required to schedule the staff at the fitness center and to "[make] sure that someone was scheduled to be there." [Boyar Tr., p. 157]. Significantly, by her own admission, Plaintiff was responsible for enforcing the policies and procedures of the YMCA as they pertained to the fitness center, and for alerting her supervisor to problems that arose there. [Boyar Tr., p. 119].

### B. Plaintiff's Termination

On Saturday April 17, 2004, Plaintiff was on-duty in the fitness center. She left the fitness center unattended for a significant period of time while she went to the bathroom, stopped at the membership desk, worked on making signs, made telephone calls regarding a CPR class and spoke with a member. [Volume II of the deposition transcript of Ilene Boyar ("Boyar II Tr."), relevant portions attached hereto as Exhibit B, pp. 15-16].

Debbie Greenwood, the Executive Director of the YMCA at that time, discovered Plaintiff at the membership desk and became upset when she learned that Plaintiff had left the fitness center unattended. [Boyar II Tr., p. 17]. Plaintiff was terminated as a result of the incident. [*See* Employee Progressive Discipline Memo dated April 17, 2004, attached hereto as Exhibit C; Boyar Tr., p. 88]. Ms. Greenwood made the decision to terminate Plaintiff. [Deposition Transcript of Debbie Greenwood ("Greenwood Tr."), relevant portions attached

3

hereto as Exhibit D at p. 19; Deposition Transcript of Jeb Backus ("Backus Tr."), relevant potions attached hereto as Exhibit E at p. 102].

Plaintiff admitted to being warned that the fitness center should not be left unattended on several occasions prior to her termination. The issue was discussed in a disciplinary memo to her dated April 19, 2001 from Chris Mogridge, the former Executive Director of the YMCA. [*See* Employee Progressive Discipline Memo dated April 17, 2001, attached hereto as Exhibit F]. Three months prior to Plaintiff's termination, she also received a memo from her supervisor, Jeb Backus stating that he "…received multiple complaints regarding the lack of staff supervision in the Wellness Center over the last two weeks." [*See* Memo to Ilene Boyar from Jeb Backus dated December 29, 2003, attached hereto as Exhibit G; Boyar Tr., pp., 187-88]. Plaintiff explained that the memorandum was addressed solely to Plaintiff because Mr. Backus wanted *her* to take care of the issue. Plaintiff admits and stated that, "staffing of the fitness center was [her] responsibility." [Boyar Tr., p. 157]. Plaintiff further admits that part of the job of fitness center staff was to ensure that the fitness center remained attended. When describing a former employee who was not doing her job, Plaintiff testified, "one of the biggest problems is Maureen was never in the Fitness Center. Maureen was always leaving the fitness center." [Boyar II Tr., p. 41]. Plaintiff also disciplined one of the staff that reported to her on at least one occasion for leaving the fitness center unattended. [*See* Employee Progressive Discipline Memo addressed to Greg Pritchett and signed by Ilene Boyar, attached hereto as Exhibit H].

When Plaintiff served as interim fitness center coordinator and believed that she had the ability to discipline staff, she testified that she did not write anybody up, rather she spoke to the staff about issues that were arising. [Boyar Tr., p. 176]. Despite her acknowledged awareness of the YMCA policy regarding required staffing at the fitness center, Plaintiff testified that she never counseled the fitness center staff not to leave the fitness center unattended because she did not see this policy as one that was enforced. Notwithstanding, she did remind her staff not to leave the fitness center unattended, testifying, "… I asked them that if they were going to leave the fitness center, please, to let at least the membership staff know that they weren't going to be in there." [Boyar Tr., pp. 177-78; *see also* Exhibit H].

### C. Plaintiff's Physical Impairment

Plaintiff suffers from osteogenesis imperfecta, a condition commonly known as brittle bone disease. [Complaint, ¶ 12]. Notwithstanding her physical condition, Plaintiff was able to attend college, shop, cook, and has full use of her hands without any limitations. [Boyar Tr., pp. 12, 19-20, 165]. Further, Plaintiff lives in a condominium on the second floor of a building that does not contain an elevator, and walks up the stairs unassisted to her unit. [Boyar Tr., pp. 16-17]. In fact, for approximately seven months, from the end of 2003 through the beginning of 2004, Plaintiff lived with her husband on the third floor of the same building, and did not require assistance to travel to and from her home.[2] [Boyar Tr., p. 18].

---

[2] These were the seven months immediately preceding her termination.

During the relevant time period, Plaintiff performed cardiovascular exercises, such as riding a stationary bicycle or using an elliptical approximately four times a week for about one hour. [Boyar Tr., p. 31]. From time to time, she also used the treadmill. [Boyar Tr., p. 158]. In fact, she exercised while she was on-duty at the YMCA. [Boyar Tr., p. 161]. Plaintiff also taught strength training classes without any assistance. [Boyar Tr., pp. 167-68]. Her medical records from Dr. Root, her treating physician, do not indicate that she was seen by him from August 28, 2003 until April 12, 2004. [Boyar II Tr., pp. 80-81].

Following her termination, Plaintiff looked for jobs in the fitness industry. [Boyar II Tr., p. 64]. She did not limit her search based on her physical condition. [Boyar II Tr., p. 65]. In fact, Plaintiff testified, "…I don't really feel like there's anything I can't—I couldn't imagine what jobs I wouldn't apply for because of my physical condition." [Boyar II Tr., p. 65].

### D. Plaintiff's Speculation that Her Physical Condition Was A Basis for Terminating Her Employment

Plaintiff does not contend that she was subjected to or heard any comments regarding her physical impairment during her ten years of employment with the YMCA. Plaintiff was suspended on or about October 23, 2003 for an incident the day before in which she divulged confidential information regarding a personnel issue imparted to her by Mr. Backus to another employee after Mr. Backus specifically asked her to keep the information confidential. [Boyar Tr., p, 127; Memorandum from Jeb Backus to Ilene Boyar dated November 4, 2003, attached hereto as Exhibit I].

Until Plaintiff's suspension for insubordination, she did not believe that Mr. Backus had issues with her performance. [Boyar Tr., p. 152]. Plaintiff asserts, however, that she had issues with Mr. Backus and that he was not "nice" to her. [Boyar Tr., p. 152]. Plaintiff listed the following as examples of Mr. Backus's attitude toward her that she characterized as not nice, "I would ask him questions that he would answer very very quickly. He was sarcastic. He didn't pay a lot of attention to the fitness center and what my needs were." [Boyar Tr., p. 153]. Although Plaintiff cannot offer any evidence that Mr. Backus discriminated against her, she speculates about the three examples listed above that, "the only thing that I can fathom is that I use crutches and that he was just trying to get rid of me." [Boyar Tr., pp. 152-153]. Other than these three examples, however, Plaintiff could not think of any other facts to support her contention that Mr. Backus "did not want her there." [Boyar Tr., p. 153]. Significantly, Plaintiff admitted that she was not the only employee who had issues with Mr. Backus. [Boyar Tr., p. 153]. She also concedes that Mr. Backus never made any comments to Plaintiff regarding her physical condition. [Boyar Tr., p. 208-09]. Finally, Mr. Backus did not make the decision to terminate Plaintiff. [Greenwood Tr., p. 19; Backus Tr., p. 102].

Plaintiff had also received discipline from her previous supervisor, Jim Amato, however, she does not contend that he discriminated against her because of her physical condition. [Boyar Tr., p. 153]. Plaintiff further admits that other employees, without any known physical condition, had problems with these supervisors. [Boyar Tr., p. 154].

### E. Plaintiff's FMLA Leave

Plaintiff took FMLA leave commencing on or about July 10, 2002. [Boyar Tr., p. 63; s*ee* Correspondence from Ilene Boyar dated July 8, 2002, attached hereto as Exhibit J]. She returned to work in October, 2002. [Boyar Tr., p. 65]. On or about December 20, 2002, Plaintiff was promoted to the position of Wellness Coordinator, almost immediately following her FMLA leave. [Boyar Tr., p. 112; s*ee* Memorandum announcing her promotion dated December 20, 2002, attached hereto as Exhibit K]. Plaintiff claims that she was discriminated against because of her FMLA leave in August 2002 because she was not permitted to apply for a position while she was on FMLA leave. [Boyar Tr., pp. 113, 116]. Her Complaint further contends that her employment was terminated on April 17, 2004 because she had taken FMLA leave in 2002. [Complaint, ¶ 40]. She did not file the instant Complaint until April 28, 2006, almost four years after the alleged refusal to allow her to apply for a new position while out on leave and more than two years after the termination of her employment.

## III. ARGUMENT

### A. Summary Judgment Standard

Pursuant to Fed.R.Civ.P. Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Choate v. Logistics Corp.*, 234 F. Supp.2d 125, 127 (D. Conn. 2002). Although the Court must draw all reasonable inferences in the light most favorable to the

party opposing the motion, a party opposing summary judgment "may not rest upon the mere allegations or denials of [her] pleading." *Id.*; Fed.R.Civ.P. 56(e).

In order to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

"In the context of a case alleging employment discrimination, conclusory allegations of discrimination are insufficient to defeat summary judgment." *Spillane v. Henderson*, 129 F.Supp.2d 223 (E.D.N.Y. 2001) (*citing Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985)). Where "an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Id.*; *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (Summary judgment affirmed where plaintiff put forward only conclusory allegations to suggest a causal relationship between her complaints and either her negative evaluation or her termination).

    **B.**    **Plaintiff's FMLA Claim is Time-Barred.**

A plaintiff must bring an FMLA cause of action within two (2) years of the alleged improper action. 29 U.S.C. § 2616(c)(1). Summary judgment is warranted if a plaintiff fails to

9

comply with this statute of limitations. *See Porter v. New York University School of Law*, 392 F.3d 530 (2nd Cir. 2004). Plaintiff took FMLA leave from June-October, 2002. [Boyar Tr., pp. 63, 65]. When asked at her deposition the basis for her FMLA claim, Plaintiff testified that she was discriminated against in August 2002 because she was not permitted to apply for a position while she was on FMLA leave. [Boyar Tr., pp. 113, 116]. Plaintiff's Complaint, filed on April 28, 2006, almost four years from the date of that leave, and, more than two years from the date of her termination renders her FMLA claim time-barred. *Id.*

Even if Plaintiff's FMLA claim was not time-barred, it would fail on the merits. Since she cannot show that employees on non-FMLA leaves were permitted to bid on open position while out, she cannot make out a violation of the FMLA because she was not allowed to apply for a position while on leave. *See* 29 C.F.R. § 825.809 (for benefits other than medical, entitlement under FMLA depends upon employer's practice as to provision during other types of leave). Neither is there evidence linking Plaintiff's FMLA leave with the termination of her employment almost two years later. *Weeks v. New York State (Division of Parole)*, 272 F.3d 76, 84 (2d Cir. 2001); *Annis v. County of Westchester*, 136 F.2d 239, 246 (2d Cir. 1998) (*citing Selan v. Kiley*, 969 F.2d 560, 565-67 (7th Cir. 1992) (two year gap between discriminating events negates the connotation that the acts were connected)). Indeed, following Plaintiff's return from FMLA leave, she was promoted almost immediately to Wellness Center Coordinator on or about December 20, 2002. [Boyar Tr., p. 112; *See* Exhibit K]. This fact alone precludes any claims that she was discriminated against as a result of her having taken FMLA leave. Thus, the lack of

any substantive evidence whatsoever of a nexus between the leave and the termination would require summary judgment on the FMLA claim even if it was not time-barred, which, of course, it is.

### C. Plaintiff Does Not Suffer from a Disability within the Meaning of the Law.

The ADA prohibits employment discrimination against a "qualified individual with a disability" because of that individual's disability. 42 U.S.C. § 12112(a). An individual has a "disability" under the ADA if she has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual."[3] 42 U.S.C. § 12102(2)(A).

Determining whether an individual has a disability within the meaning of the ADA requires an initial three step analysis: (1) whether the individual suffered from a physical or mental impairment; (2) identifying the major life activity that the individual claims to be limited in; and (3) determining whether the individual's impairment substantially limited the identified major life activities. *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2nd Cir. 1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253 (1999). A plaintiff must satisfy all three prongs in order to establish that she is disabled within the meaning of the ADA. *Id.*

For purposes of this motion, the YMCA does not dispute that Plaintiff has osteogenesis imperfecta or that it is a physical impairment. *See* 29 C.F.R. § 1630.2(h) (physical impairment

---

[3] While "disability" also includes having a record of such an impairment or being regarded as having such an impairment, 42 U.S.C. § 12102(2) (B) & (C), Plaintiff's Complaint does not assert such claims. (*See,* Complaint, ¶ 36 "The Defendant's actions as described herein violation (sic) section 102 of the ADA, 42 U.S.C. § 12112).

includes any physiological disorder or condition affecting musculoskeletal system) or that standing, walking and performing manual tasks[4] are major life activities under the ADA. *See* 29 C.F.R. § 1630.2(i) (major life activities include performing manual tasks and walking); 29 C.F.R. app. § 1630.2(i) (major life activities include standing). Thus, the relevant inquiry for purposes of this motion involves the third prong of the analysis, whether there is any evidence that Plaintiff's physical impairment substantially limits any major life activity.

    **1.    Plaintiff's Condition Does Not Substantially Limit Any Major Life Activities.**

The mere fact that an individual has a physical impairment does not render one disabled under the ADA. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681 (2002). Rather, a plaintiff must establish a limitation on a major life activity that is substantial. *Id.* The Second Circuit utilizes the EEOC's definition and regulations governing the term "substantially limits" when analyzing whether an impairment substantially limits a plaintiff's major life activities. *See Colwell, supra*, 158 F.3d at 643; *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2nd Cir. 1998); *Piascyk v. City of New Haven*, 64 F.Supp.2d 19, 27 (D. Conn. 1999), *aff'd* 246 F.3d 1072 (2nd Cir. 2000). The EEOC defines "substantially limits" as follows:

    (i) Unable to perform a major life activity that the average person in the general population can perform; or

---

[4] These are the major life activities listed in the Complaint. [Complaint, ¶ 14].

>   (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

Similarly, the Supreme Court has stated that "substantially" in this context means "considerable or to a large degree." *Toyota Motor Manufacturing, Kentucky, Inc.*, *supra*, 534 U.S. at 196.  While "almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.  Thus, in assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." (Emphasis in original). *Grae & Rybicki, P.C.*, *supra*, 135 F.3d at 870; *see also Toyota Motor Manufacturing, Kentucky, Inc.*, *supra*, 534 U.S. at 196 ("[t]he word substantial thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities").  Moreover, the mere fact that an impairment may be incurable does not automatically result in a finding of substantial limitation.  For example, *Grae & Rybicki, supra*, a legal secretary was diagnosed with ulcerative colitis of the rectum.  The court found there was no substantial limitation even though there was no cure for the impairment and would trouble her for life because the condition was symptomatic at certain times and can be asymptomatic for long periods.  135 F.3d at 870.